UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GEORGE BETAK,<br><br>    Plaintiff,<br><br>v.<br><br>VALERY MIFTAKHOV, et al.,<br><br>    Defendants. | Case No. 19-cv-02516-JSC<br><br>**ORDER RE: DEFENDANTS' MOTIONS TO DISMISS**<br><br>Re: Dkt. Nos. 22, 30 |

George Betak sues Electric Motor Werks, Inc. ("EMW"), Enel X North America ("Enel X") (together, "Corporate Defendants"), and Valery Miftakhov for correction of inventorship of two patents related to Plaintiff's work on an electric vehicle charging product. (Dkt. No. 1 at 2.)[1] Before the Court are Corporate Defendants' and Mr. Miftakhov's motions to dismiss, (Dkt. Nos. 22 & 30), pursuant to Federal Rule of Civil Procedure 12(b)(6).[2] After careful consideration of the parties' briefing and having had the benefit of oral argument on October 30, 2019, the Court DENIES Defendants' motions.

## BACKGROUND

**I.**  **The Parties**

    **A.**  **Plaintiff**

Plaintiff is an "electrical engineer, software engineer, and computer scientist." (Dkt. No. 1 at ¶ 12.) He has worked for multiple "technology and automotive companies in the United States and Europe," and "holds a Master of Science degree in Computer Science." (*Id.*) Plaintiff is "well-known in the local and national electric vehicle community" through his role as "co-founder and former President of a non-profit organization called the San Francisco Bay Area Nissan LEAF

---

[1] Record citations are to material in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of the documents.
[2] All parties have consented to the jurisdiction of a magistrate judge pursuant to 28 U.S.C. § 636(c). (*See* Dkt. Nos. 12, 20, 21.)

1  Owners Association" ("SF BayLEAF"), as well as other "work in the electric vehicle community." (*Id.* at ¶¶ 14-19.) He resides in California. (*Id.* at ¶ 1.)

### B. Defendants

EMW is a corporation organized under Delaware law, with its principal place of business in California. (*Id.* at ¶ 3.) It is "registered to do business in California and can be served through its agent for service of process," Mr. Miftakhov. (*Id.*) EMW applied for and was granted two patents that are the subject of this litigation ("Patents at Issue"). (*See* Dkt. No. 1, Exs. A-B at 30-56.)

Enel X[3] is a corporation organized under Delaware law, with its principal place of business in Massachusetts. (Dkt. No. 1 at ¶ 4.) On October 25, 2017, Enel X acquired EMW for approximately $153,460,000. (*Id.* at ¶ 69.) Through this transaction Enel X acquired "EMW's assets, including all of EMW's patents, patent applications, and other intellectual property." (*Id.* at ¶ 70.) EMW remains in operation, however. (*Id.* at ¶ 77.)

Mr. Miftakhov is the current Chief Executive Officer ("CEO") of EMW "and a substantial shareholder of that entity." (*Id.* at ¶¶ 2, 77.) He has held the position of CEO at all times relevant to the instant action. (*Id.*) The Patents at Issue identify Mr. Miftakhov as an inventor. (*See* Dkt. No. 1, Ex. A at 30, Ex. B at 43.)

## II. Complaint Allegations

The gravamen of the complaint is that Plaintiff contributed to the conception of certain technologies reflected in the Patents at Issue, but those patents do not identify him as an inventor.

### A. The JuiceBox/JuiceNet Project

Plaintiff met Mr. Miftakhov at an SFBayLEAF meeting in July 2013. (Dkt. No. 1 at ¶ 21.) Mr. Miftakhov was promoting an EMW fundraising campaign "to fund the development and production of an open source do-it-yourself kit for building a level 2 electric vehicle charging station" that would use a 240-volt outlet instead of the 120-volt outlet used in level 1 charging stations. (*Id.* at ¶ 22.) EMW's fundraising campaign advertised "its charging station, known as

---

[3] According to the complaint, "Enel X was previously known as EnerNOC, Inc. and changed its name . . . on or about October 24, 2018." (Dkt. No. 1 at ¶ 5.)

2

'JuiceBox,'" as a less expensive version of "other level 2 charging stations" on the market at the time. (*Id.*) Plaintiff and Mr. Miftakhov "discussed their shared interest in electric vehicles and their involvement in the electric vehicle industry" and "remained in contact after the event." (*Id.* at ¶ 23.)

In May 2014, Plaintiff met with Mr. Miftakhov "and proposed the idea of making a new JuiceBox product in which every JuiceBox unit would be Wi-Fi-enabled and 'connected' to the internet." (*Id.* at ¶ 24.) Plaintiff further proposed enabling the new product to "collectively operate in communication with other entities and information sources, such as grid operators and energy providers." (*Id.*) Plaintiff then worked with Mr. Miftakhov "and others to refine the system that [Plaintiff] had envisioned, through periodic communications, meetings, and 'brainstorming' sessions." (*Id.* at ¶ 25.) "Through these joint efforts, they determined that the system that [Plaintiff] contemplated could use cloud-based software and data from grid operators and energy providers to automatically charge the electric vehicles during periods when the energy providers and grid operators offered electricity at lower prices." (*Id.*) Further, "by controlling the collective network of JuiceBox charging stations, the system that Plaintiff . . . conceived and helped refine could generate a new revenue stream." (*Id.* at ¶ 27.)

On May 21, 2014, Mr. Miftakhov "approached Plaintiff . . . about collaborating on the next generation of JuiceBox product, which would include the connectivity features that [Plaintiff] had proposed." (*Id.* at ¶ 28.) The product that "eventually resulted from this collaboration was controlled using a platform called 'JuiceNet,' which included, among other things, software and a mobile device application that uses historical patterns, real-time input, and data from energy providers, grid operators, and other sources to aggregate and manage charging station usage." (*Id.*)

In June 2014, Mr. Miftakhov and Plaintiff agreed that Plaintiff would join the JuiceBox/JuiceNet collaboration (the "Project") "in a 'co-founder sort of role' [in] the business that resulted from the . . . collaboration." (*Id.* at ¶ 30.) Mr. Miftakhov proposed that the Project would proceed "under the auspices of a new company called EV Juice, Inc." ("EV Juice"), instead of through EMW. (*Id.* at ¶ 31.) However, the Project did not proceed under EV Juice, and was

3

instead held out by Mr. Miftakhov and EMW "as an EMW endeavor." (*Id.* at ¶ 37.) Likewise, Mr. Miftakhov and EMW "held out Plaintiff . . . as part of the EMW organization," assigned him an EMW email account, and publicly identified him "as EMW's 'VP, Business Development & Community'" on EMW's website.[4] (*Id.* at ¶¶ 37-38, 40.) "Because the [P]roject progressed under EMW, [Plaintiff] never worked for EV Juice, as an employee or otherwise." (*Id.* at ¶ 37.)

At the time Plaintiff and Mr. Miftakhov began collaborating on the Project, Plaintiff "was the only formally-trained engineer working on the [P]roject." (*Id.* at ¶ 36.) Plaintiff worked full-time on the Project for the first nine months, and "[o]ver the course of his work . . . with Miftakhov and others, [Plaintiff] conceived, or helped conceive many significant inventions that were ultimately incorporated into the [P]roject." (*Id.* at ¶ 44.) These inventions include:

> (1) "making every JuiceBox 'connected' via Wi-Fi and the JuiceNet cloud-based software, including with the grid operators and energy providers, so that the resulting system can automatically charge the electric vehicles during times when electricity is inexpensive and reduce charging when the grid operators and energy providers offer incentives for reducing electricity usage";
>
> (2) "adding and communicatively coupling a revenue-grade electric meter with each JuiceBox charging station"; and
>
> (3) "using a 'user preference' approach for the software controlling each JuiceBox charging station, in which the user would enter their charging preferences . . ., and the software would then model and control the charging station based on the user's preferences and their actual charging behavior."

(*Id.* at ¶¶ 45-47.) Plaintiff also "actively participated and collaborated" in conceiving "many if not all of the other significant inventions associated with the [Project]." (*Id.* at ¶ 48.)

Mr. Miftakhov and EMW filed patent applications with the United States Patent and Trademark Office ("USPTO") that describe inventions that Plaintiff "invented or helped to invent, including by conceiving of the inventive elements described above" (the "Applications at Issue"). (*Id.* at ¶ 49.) Despite being aware of Plaintiff's "significant contributions to the conception of the inventions described and claimed in the Applications at Issue," Mr. Miftakhov and EMW did not

---

[4] Plaintiff "remained on the EMW management email distribution list, . . . and continued receiving emails sent to the EMW management team until" July 2016, and EMW identified Plaintiff "as a member of its management team until" November 2016. (*Id.* at ¶ 68.)

4

identify Plaintiff "as an inventor in filing and prosecuting some of the[ ] applications."[5] (*Id.* at ¶ 50.) Further, Mr. Miftakhov and EMW excluded Plaintiff "from the process of filing and prosecuting the Applications at Issue." (*Id.*)

### B. The Patents at Issue

In June 2018, the USPTO "granted and issued United States Patent No. 9,987,941, entitled 'Systems and Methods for Local Autonomous Response to Grid Conditions by Electric Vehicle Charging Stations.'" (*Id.* at ¶ 54; *see also id.*, Ex. A at 30-41 (the "'941 Patent").) The '941 Patent issued from an application EMW filed on September 14, 2015. (Dkt. No. 1, Ex. A at 30.) The September 2015 application "claim[ed] priority to a provisional application that was filed" exactly one year earlier. (Dkt. No. 1 at ¶ 81; *see also id.*, Ex. A at 30.) The '941 Patent includes Mr. Miftakhov, among others, as an inventor. (Dkt. No. 1, Ex. A at 30.) However, the "Patent does not identify [Plaintiff] as an inventor," despite Plaintiff's "contribut[ion] to the technologies claimed in the '941 Patent." (Dkt. No. 1 at ¶ 54.)

In July 2018, "the USPTO granted and issued United States Patent No. 10,025,277, entitled 'Systems and Methods for Electrical Charging Load Modeling Services to Optimize Power Grid Objectives." (*Id.* at ¶ 55; *see also id.*, Ex. B at 43-56 (the "'277 Patent").) The '277 Patent issued from an application EMW filed on January 24, 2016. (Dkt. No. 1, Ex. B at 43.) The January 2016 application "claim[ed] priority to a provisional application that was filed" on September 14, 2014. (Dkt. No. 1 at ¶ 87; *see also id.*, Ex. B at 43.) The Patent lists the same inventors as listed for the '941 Patent, including Mr. Miftakhov. (*Id.*) And as with the '941 Patent, the '277 Patent does not include Plaintiff as an inventor, despite his "contribut[ion] to the technologies claimed in the '277 Patent." (Dkt. No. 1 at ¶ 55.)

Mr. Miftakhov and the other inventors identified in the Patents at Issue assigned their rights to the inventions claimed in the patents to EMW. (*Id.* at ¶ 56.) Plaintiff had no knowledge

---

[5] The complaint alleges that Plaintiff was named as a co-inventor on one application only because he "objected to his omission" after learning that Miftakhov and EMW were preparing a patent application for an invention that Plaintiff helped conceive and were not planning to name Plaintiff as an inventor. (Dkt. No. ¶ 52.)

5

of, and did not consent to, that assignment. (*Id.*) Further, Plaintiff "did not execute, and has not executed, any assignments with regard to the Applications at Issue, or any patents that resulted from th[ose] applications." (*Id.* at ¶ 57.)

### C. Enel X Acquires EMW

In September 2017, Mr. Miftakhov called Plaintiff and told him that EMW "was going to be acquired by a European energy company." (*Id.* at ¶ 69.) Enel X, "which was then known as EnerNOC, Inc.," acquired EMW on October 25, 2017. (*Id.*) As previously discussed, Enel X acquired EMW's "patents, patent applications, and other intellectual property," through the transaction. (*Id.* at ¶ 70.) Plaintiff "was not asked to consent to, and did not consent to, the purported transfer of the [patents at issue], or any other intellectual property rights to Enel X." (*Id.*)

## III. Procedural History

Plaintiff filed his complaint on May 9, 2019, bringing claims for: (1) correction of inventorship of the '941 Patent against all Defendants; (2) correction of inventorship of the '277 Patent against all Defendants; and (3) various state law claims. (Dkt. No. 1 at 18-26.) In July 2019, Defendants filed their respective motions to dismiss. (*See* Dkt. Nos. 22 & 30.) The motions are fully briefed. (*See* Dkt. Nos. 33, 35, 36, 44.)

On October 24, 2019, the parties stipulated to Plaintiff's voluntarily withdrawal, without prejudice, of the state law claims (Counts III-VIII). (Dkt. No. 52.) The stipulation specified that Defendants' motions to dismiss the complaint were thus moot "insofar as they relate to Counts III-VIII," but the motions were "unaffected by th[e] stipulation" as to Counts I and II. (*Id.* at 2-3.) The Court heard oral argument on October 30, 2019.

## REQUEST FOR JUDICIAL NOTICE

Generally, "district courts may not consider material outside the pleadings when assessing the sufficiency of a complaint under Rule 12(b)(6)." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998 (9th Cir. 2018). When such materials "'are presented to and not excluded by the court,' the 12(b)(6) motion converts into a motion for summary judgment under Rule 56." *Id.* (quoting Fed. R. Civ. P. 12(d)). There are, however, "two exceptions to this rule: the

6

incorporation-by-reference doctrine, and judicial notice under Federal Rule of Evidence 201."[6] *Id.*

First, "[a] court may consider evidence on which the complaint necessarily relies if: (1) the complaint refers to the document; (2) the document is central to the plaintiff's claim; and (3) no party questions the authenticity of the copy attached to the 12(b)(6) motion." *Marder v. Lopez*, 450 F.3d 445, 448 (9th Cir. 2006) (internal quotation marks and citation omitted). Second, a court may take judicial notice of an "adjudicative fact" pursuant to the Federal Rules of Evidence, if that fact is one "that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b).

Here, Corporate Defendants appear to conflate the incorporation-by-reference doctrine with a request for judicial notice under Rule 201(b) and request "judicial notice" of two U.S. patent applications that are "cited as references on the respective faces of the patents at issue": (1) U.S. Patent Appl. Pub. No. 2013/0179061 to Gadh et al. ("Gadh Application"); and (2) U.S. Patent Appl. Pub. No. 2009/0021213 to Johnson ("Johnson Application"). (Dkt. No. 22-1 at 5 (citing Dkt. No. 22-2, Exs. A-B).) Corporate Defendants assert that the Gadh and Johnson Applications are proper subjects for judicial notice because they are "cited as references to the patents in suit," and are thus "central to [Plaintiff's] corrected inventorship claims because a conception determination . . . requires consideration of the state of the art." (*Id.*) Corporate Defendants' motion to dismiss asserts that the prior art reflected in the Gadh and Johnson Applications demonstrates that Plaintiff's alleged contributions to the Patents at Issue were insignificant because they "merely explained the current state of the art." (Dkt. No. 22 at 19-21.) Plaintiff opposes judicial notice of both Applications because he disputes "the scope and content" of the prior art reflected in the Applications. (Dkt. No. 31 at 3.)

//

---

[6] The parties do not dispute that the Court's consideration of the Patents at Issue, which are attached to Plaintiff's complaint, is proper. The Court agrees that it may consider those materials in deciding the instant motion because they are attached to the complaint. *See United States v. Corinthian Colleges*, 655 F.3d 984, 998-99 (9th Cir. 2011) (noting that courts may "consider materials that are submitted with and attached to the Complaint" in deciding a Rule 12(b)(6) motion).

7

## I. Incorporation by Reference

The Court declines to consider the Applications pursuant to the incorporation-by-reference doctrine. The complaint references the Patents at Issue and includes them as exhibits. The '941 Patent cites the Johnson Application in its "References Cited." (*See* Dkt. No. 1, Ex. A at 30.) The '277 Patent cites the Gadh Application in its "References Cited." (*See id.*, Ex. B at 43.) The complaint does not, however, reference either the Gadh Application or the Johnson Application and Plaintiff's claims do not otherwise "necessarily depend[ ] on them." *See Khoja*, 899 F.3d at 1002 (noting that incorporation by reference is appropriate where a document is not referenced in the complaint, but the plaintiff's claim necessarily depends on it). Instead, the Applications "merely create[ ] a defense to the well-pled allegations in the complaint," and as such, do "not necessarily form the basis of the complaint." *See id.* Defendants do not cite a case, and the Court is not aware of any, that permits consideration of material outside the pleadings on a 12(b)(6) motion because they are central to a defense. Thus, the Court denies Corporate Defendants "request for judicial notice" to the extent it asserts that incorporation by reference is proper.

## II. Judicial Notice Pursuant to Rule 201(b)

Judicial notice of the *existence* of both the Gadh and Johnson Applications is appropriate because they are published U.S. patent applications. *See Anderson v. Kimberly-Clark Corp.*, 570 F. App'x 927, 932 n.4 (9th Cir. 2014) (declining to address whether the district court properly considered a patent application that was "prior art to the [patent at issue], but noting that "the court may properly take judicial notice of the . . . publication as a patent application") (citing *Hoganas AB v. Dresser Indus., Inc.*, 9 F.3d 948, (Fed. Cir. 1993) (taking judicial notice of patent application pursuant to Fed. R. Evid. 201(b)(2))). Corporate Defendants ask the Court to go a step further, however, and judicially notice the *content* of the Gadh and Johnson Applications as it concerns the prior art relevant to the Patents at Issue and Plaintiff's alleged contributions regarding same. The Court declines to do so at this stage because Plaintiff reasonably disputes Corporate Defendants' characterization of that content. *See CODA Dev. S.R.O. v. Goodyear Tire & Rubber Co.*, 916 F.3d 1350, 1360 (Fed. Cir. 2019) (finding legal error where district court granted judicial notice of published article written by one plaintiff because whether that article publicly disclosed the "novel

8

trade secrets" at issue "was a reasonably (indeed, hotly) disputed factual issue . . . outside any judicial-notice exception to the general rule requiring conversion, and one that should not have been resolved adversely to [p]laintiffs on a motion to dismiss"); *see also Von Saher v. Norton Simon Museum of Art at Pasadena*, 592 F.3d 954, 960 (9th Cir. 2010) ("Courts may take judicial notice of publications introduced to indicate what was in the public realm at the time, not whether the contents of those articles were in fact true") (internal quotation marks and citation omitted).

Corporate Defendants attempt to distinguish *CODA* by arguing that here "there is no reasonable dispute as to what Gadh and Johnson disclose." (Dkt. No. 36-1 at 3-4 (asserting that "Gadh's disclosure directly matches and tracks [Plaintiff's] contributions as he alleges them").) The Court disagrees. Adopting Corporate Defendants' view of what the Applications disclose and how those disclosures relate to the prior art of the Patents at Issue and Plaintiff's allegations would be impermissible at this stage. *See CODA*, 916 F.3d at 1360 n.7 (noting that consideration of a "prior, published patent application to determine that the alleged novel trade secrets were already in the prior art, was improper at [the motion to dismiss] stage," because "it constituted an inference adverse to [p]laintiffs when there were other reasonable inferences to draw in their favor").

The cases cited by Corporate Defendants do not counsel a different result because there is no indication that the plaintiffs in those cases argued that the content of proffered material was subject to reasonable dispute or that the plaintiffs otherwise opposed judicial notice. *See, e.g., Anderson*, 570 F. App'x at 932 (noting the plaintiff's argument that the "[district] court improperly considered evidence not attached to the [complaint]" in granting defendant's motion for judgment on the pleadings), No. C12-1979RAJ, 2013 WL 9760040, at *2 (W.D. Wash. Sept. 25, 2013) (taking judicial notice without explanation of patent application that was prior art to the patent at issue); *Coffelt v. NVIDIA Corp.*, CV 16-00457 SJO (KKx), 2016 WL 7507763, at *2 n.3 (C.D. Cal. June 21, 2016) (taking judicial notice of prosecution history of patent at issue and noting that "[p]laintiff does not object to or in any way oppose [d]efendant's request"); *Klang v. Pflueger*, No. SACV 13-01971 JVS (DFMx), 2014 WL 4922401, at *1 (C.D. Cal. July 10, 2014) (taking judicial notice of USPTO patent assignment records and the patents at issue "because they

9

are public records").[7]

Accordingly, the Court GRANTS Corporate Defendants' request for judicial notice of the Gadh and Johnson Applications to the extent the Court notices that the Applications exist. The Court DENIES the request for judicial notice in all other respects because Plaintiff disputes the content of the Gadh and Johnson Applications as it relates to the prior art of, and Plaintiff's alleged contributions to, the Patents at Issue.

**DISCUSSION**

Defendants' motions seek dismissal of Plaintiff's correction of inventorship claims pursuant to Federal Rule of Civil Procedure 12(b)(6).[8] A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of a complaint as failing to allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A facial plausibility standard is not a "probability requirement" but mandates "more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks and citation omitted). Thus, a complaint "that offers labels and conclusions or a formulaic recitation of the elements of a cause of action" is insufficient, as is a complaint that "tenders naked assertsion[s] devoid of further factual enhancement." *Id.* (internal quotation marks and citation omitted). To survive dismissal, a complaint must allege "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* For purposes of ruling on a Rule 12(b)(6) motion, courts must "accept factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Mar. Ins. Co.*, 519 F.3d 1025, 1031 (9th

---

[7] Corporate Defendants cite other cases in support of "judicial notice," however, those cases involved the incorporation-by-reference doctrine, not judicial notice pursuant to Federal Rule of Evidence 201(b). *See, e.g.*, *Marder*, 450 F.3d at 448; *Eastman v. Apple Inc.*, No. 18-cv-05929, 2018 WL 5982440, at *5-6 (N.D. Cal. Nov. 14, 2018).

[8] Mr. Miftakhov's motion to dismiss does not set forth any independent, substantive arguments regarding Counts I and II and instead "joins in, and incorporates . . . the arguments, accompanying exhibits, and facts set forth in . . . the Corporate Defendants' [motion]." (Dkt. No. 30 at 13.) Mr. Miftakhov's reply brief likewise incorporates the portions of Corporate Defendants' reply brief regarding Counts I and II. (Dkt. No. 44 at 5-6.) Thus, the Court need not address each motion to dismiss individually and cites only Corporate Defendants' motion and reply for purposes of this section.

Cir. 2008).

35 U.S.C. § 256 "provides a cause of action to interested parties to have the inventorship of a patent changed to reflect the true inventors of the subject matter claimed in the patent." *CODA*, 916 F.3d at 1358 (internal quotation marks and citation omitted). "Conception is the touchstone of inventorship, the completion of the mental part of invention." *Burroughs Wellcome Co. v. Barr Labs., Inc.*, 40 F.3d 1223, 1227-28 (Fed. Cir. 1994). "As to joint inventorship, a joint inventor must contribute to the invention's conception." *CODA*, 916 F.R.D. at 1358; *see also Fina Oil & Chem. Co. v. Ewen*, 123 F.3d 1466, 1473 (Fed. Cir. 1997) ("[T]o be a joint inventor, an individual must make a contribution to the conception of the claimed invention that is not insignificant in quality, when that contribution is measured against the dimension of the full invention."). "Contributions to realizing an invention may not amount to a contribution to conception if they merely explain what was then state of the art, if they are too far removed from the real-world realization of an invention, or if they are focused solely on such realization." *Eli Lilly & Co. v. Aradigm Corp.*, 376 F.3d 1352, 1359 (Fed. Cir. 2004) (internal quotation marks and citations omitted). Further, an alleged joint inventor "must demonstrate that his labors were conjoined with the efforts of the named inventors." *Id.* (noting that joint inventorship "can only arise when collaboration or concerted effort occurs—that is, when the inventors have some open line of communication during or in temporal proximity to their inventive efforts"). A joint inventor need not "contribute to every claim—a contribution to one claim is enough." *CODA*, 916 F.3d at 1358.

To survive dismissal, the complaint must allege facts giving rise to a reasonable inference that Plaintiff contributed to the conception of at least one claim of each Patent at Issue. Defendants argue that even accepting Plaintiff's alleged contributions to conception as true, those contributions are: (1) not claimed in the Patents at Issue; and (2) insignificant because they merely explained the current state of the art. (Dkt. Nos. 22 at 12.) The Court addresses each argument and Patent at issue in turn.

**I.      Whether Plaintiff's Alleged Contributions are Claimed**

      **A.      The '941 Patent**

The complaint alleges that Plaintiff is a joint inventor of the '941 Patent; specifically,

11

claims 1 and 11, "the only two independent claims."[9] (Dkt. No. 1 at ¶ 81.) The '941 Patent relates "in general to the field of electrical vehicle charging technology and power grid management" and is specifically directed "to systems and methods for local autonomous response to grid conditions by electric vehicle charging stations." (Dkt. No. 1, Ex. A at 35 (1:18-22).) Claim 1 sets out an embodiment of the disclosed system:

> 1. A system for generating a local autonomous response to a condition of an electric grid by a plurality of electric vehicle charging stations, the system comprising:
>
>     a. a first electricity meter for reading current, frequency, or voltage from a first electricity supply line to one of the plurality of electric vehicle charging stations;
>
>     b. a second electricity meter for reading current, frequency, or voltage from a second electricity supply line to all of the plurality of electric vehicle charging stations;
>
>     c. a third electricity meter for reading current, frequency, or voltage from a third electricity line from one or more renewable generators; and
>
>     d. an electric vehicle charging controller operatively coupled to the first electricity meter, the second electricity meter, the third electricity meter and the plurality of electric vehicle charging stations and operable to obtain readings from the first electricity meter, the second electricity meter and the third electricity meter and to control at least one of the plurality of electric vehicle charging stations based on the obtained readings.

(*Id.* at 40 (11:61-12:16).) The complaint alleges, in pertinent part:

> Claims 1 and 11 of the '941 Patent purport to claim, for example, the "connected" electric vehicle charging system and method that [Plaintiff] first proposed to Defendant Miftakhov in May 2014, approximately four months before the provisional application was filed in September 2014. Claims 1 and 11 also claim the use of an electricity meter at the charging station, another one of [Plaintiff's] inventive contributions.

(*Id.*) As previously discussed, the complaint details Plaintiff's contribution to the alleged

---

[9] The parties do not dispute that claim 11 of the '941 Patent sets forth a method that is "substantially similar to system claim 1." (*See* Dkt. Nos. 33 at 10 & 22 at 15 n.4 (asserting that the arguments in Corporate Defendants' motion "raised as to claim 1 apply equally to claim 11").) Indeed, the language of the "method" encompassed by claim 11 tracks the language of claim 1. (*Compare* Dkt. No. 1, Ex. A at 40 (11:61-12:16) *with id.* at 41 (13:4-26).) Thus, the Court need only address the allegations as related to claim 1.

"connected" inventions of claims of 1 and 11 as:

> conceiv[ing] and work[ing] with others to refine the concept of making every JuiceBox 'connected' via Wi-Fi and the JuiceNet cloud-based software, including with the grid operators and energy providers, so that the resulting system can automatically charge the electric vehicles during times when electricity is inexpensive and reduce charging when the grid operators and energy providers offer incentives for reducing electricity usage.

(*Id.* at ¶ 45.) Further, as to the alleged "electricity meter" invention included in claims 1 and 11, the complaint alleges that Plaintiff "conceived of the idea of adding and communicatively coupling a revenue-grade electric meter with each JuiceBox charging station" that "allows the JuiceBox system to accurately measure the energy usage of each charging station." (*Id.* at ¶ 46.)

Defendants argue that the complaint's allegations regarding Plaintiff's contributions to the inventions set forth in claims 1 and 11 are not plausible because those claims, by their express terms, "do not recite Wi-Fi connected charging stations or revenue-grade electricity meters." (Dkt. No. 22 at 14-15.) Plaintiff counters that Defendants' characterization of the allegations does not consider the complaint as a whole. Plaintiff further asserts that the complaint adequately alleges that he "conceived and worked with others to refine and develop" the "overall 'connected' system" disclosed in claim 1, and its "use of meters at the charging station." (Dkt. No. 33 at 16 (citing Dkt. No. 1 at ¶¶ 24-27).) The Court agrees. Plaintiff's allegations as a whole, and in particular regarding his contributions to the conception of an "electricity meter . . . to accurately measure the energy usage of each charging station," give rise to a reasonable inference that he is a co-inventor of the '941 Patent. (*See* Dkt. No. 1 at ¶ 46.) To put it another way, on this record the Court cannot say as a matter of law that Plaintiff's alleged contributions are *not* encompassed by the '941 Patent. *See Skinner v. Switzer*, 562 U.S. 521, 529-30 (noting that the question on a Rule 12(b)(6) motion is "not whether [the plaintiff] will ultimately prevail . . ., but whether his complaint [is] sufficient to cross the federal court's threshold").

Defendants' argument that Count I fails because the '941 Patent does not specify the "revenue-grade" meter alleged by Plaintiff is unpersuasive. (*See* Dkt. No. 36 at 6-7.) Taking Plaintiff's allegations as true, [o]ver the course of his work on the . . . [P]roject with Miftakhov and others," he conceived of a "revenue-grade electric meter" for each charging station that

13

measures the station's energy usage. (*See* Dkt. No. 1 at ¶¶ 44, 46.) At this stage, the Court cannot determine the dispositive import of the phrase "revenue-grade" as it relates to claim 1's "first electricity meter for reading current, frequency, or voltage from a first electricity supply line to one of the plurality of electric vehicle charging stations." (*See* Dkt. No. 1, Ex. A at 40 (11:65-67).) Thus, the Court cannot conclude that the "revenue-grade electric meter" that Plaintiff allegedly conceived and the "first electricity meter" described in claim 1 do not concern the same "subject matter." *See Sewall v. Walters*, 21 F.3d 411, 415 (Fed. Cir. 1994) (noting that "[d]etermining 'inventorship' is nothing more than determining who conceived the subject matter at issue").

### B. The '277 Patent

The complaint alleges that Plaintiff is a joint inventor of the '277 Patent; specifically, claims 1 and 12.[10] (Dkt. No. 1 at ¶ 87.) Like the '941 Patent, the '277 Patent relates "in general to the field of electric charging technology, such as electric vehicle charging, as well as to power grid management." (Dkt. No. 1, Ex. B at 50 (1:31-33).) The Patent is directed to "systems and methods for electrical charging load modeling services to optimize power grid objectives." (*Id.* (1:34-35).) Claim 1 sets out an embodiment of the disclosed system:

> 1. A computerized system for electrical charging load modeling to optimize power grid objectives, the system comprising:
>
> a. a plurality of charging assets; and
>
> b. a cloud server comprising at least one processing unit, the cloud server comprising:
>
> > i. a data aggregation module configured to collect and aggregate a plurality of information items;
> >
> > ii. an analytics module configured to identify at least one temporal model associated with the data collected and aggregated by the data aggregation module;
> >
> > iii. a charging module configured to determine a charging pattern for each of the plurality of charging assets, the

---

[10] As with the relationship between "system" claim 1 and "method" claim 11 of the '941 Patent, the language of "method" claim 12 of the '277 Patent tracks the language of claim 1. (*Compare* Dkt. No. 1, Ex. B at 55 (11:23-51) *with id.* at 41 (13:4-26).) Thus, the Court need only address the allegations as related to claim 1.

14

> charging pattern comprising information on time intervals when each of the plurality of charging assets is to be charged, including the beginning and ending times of the charging operation and information on a level of charging during each charging time interval;
>
> iv. a charger asset module configured to control charging of the plurality of charging assets in accordance with the determined charging patterns by issuing a control command to each of the plurality of charging assets; and
>
> v. a communication module for communicating the control command issued by the charger asset module to the respective charging asset via a data network.

(Dkt. No. 1, Ex. B at 55.) The complaint alleges that Plaintiff "made significant contributions to the conception and reduction to practice of [the] inventions" encompassed in the '277 Patent, including "the technology claimed in claims 1 and 12." (Dkt. No. 1 at ¶ 87.) In pertinent part:

> Claims 1 and 12 of the '277 Patent claim, for example a "computerized system" and "computer-implemented method" for load-modeling to enable an electrical grid to deliver power efficiently to "charging assets" for use in charging electric vehicles, for use with the "connected" electric vehicle charging system and method that Plaintiff . . . first proposed to Defendant Miftakhov in May 2014, approximately four months before the provisional application was filed on September 2014.

(*Id.*) Further:

> As another example, claims 1 and 12 require the determination of a "charging patter for each plurality of charging assets" and controlling "charging of the plurality of charging assets in accordance with the determined charging patterns." This claims the "user preference approach for controlling the JuiceBox charging station that Plaintiff . . . proposed, in which the software models and controls the charging station based on the user's actual charging behavior.

(*Id.*) As with the '941 Patent, Defendants argue that Plaintiff's alleged contributions are not expressly claimed in the '277 Patent. (*See* Dkt. No. 22 at 17-18.) Defendants' argument is similarly unpersuasive at this stage, and better suited for summary judgment. Simply put, accepting Plaintiff's allegations as true and drawing all inferences in his favor, the Court cannot say that the "computerized system" described in claim 1 of the '277 Patent does not concern the same "'connected' electric vehicle charging system and method" that Plaintiff alleges he first proposed to Mr. Miftakhov in May 2014, or that the '277 Patent does not incorporate Plaintiff's alleged "idea of using a 'user preference' approach for the software controlling each JuiceBox

15

charging station." (*See* Dkt. No. 1 at ¶¶ 47, 87.) At this stage, the complaint's allegations as a whole give rise to a reasonable inference that he is a co-inventor of the '277 Patent. Accordingly, the Court denies Defendants' motions to extent they assert that dismissal is warranted because the Patents at Issue do not claim Plaintiff's alleged contributions.

## II. Whether Plaintiff's Alleged Contributions are Insignificant

Defendants argue that Plaintiff's alleged contributions "merely explained the current state of the art," of the Patents at Issue and are thus insignificant. (Dkt. No. 22 at 19.) In support, Defendants rely solely on the content of the Gadh and Johnson Applications, (*see id.* at 19-21), which the Court declines to judicially notice. Thus, the Court denies Defendants' motions to the extent they argue that dismissal is warranted on these grounds.

## CONCLUSION

For the reasons set forth above, the Court DENIES Corporate Defendants' and Mr. Miftakhov's motions to dismiss. Taking the complaint's allegations as true and drawing all reasonable inferences in Plaintiff's favor, he has stated claims for correction of inventorship.

This Order disposes of Docket Nos. 22, 30.

**IT IS SO ORDERED.**

Dated: October 31, 2019

JACQUELINE SCOTT CORLEY
United States Magistrate Judge